# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| William M. Tyree, Jr., James Murphy, and Marcus DeAmicis,<br><br>Plaintiffs,<br><br>v.<br><br>William F. Weld, Thomas Rapone, Larry DuBois, and Michael Maloney,<br><br>Defendants. | CIVIL ACTION NO. 93-12260-NG |
| Ronald Peterson, Daniel Karivan, Thomas Ryan, Thomas M. Hurley, Patrick Burke, William Engleheart, John Shea, Timothy Brady, Clyde Dempsey, and James Murphy,<br><br>Plaintiffs,<br><br>v.<br><br>Larry Dubois, Commissioner, Ronald Duval, Superintendent, Mark Powers, Deputy Superintendent John Doe ("Toby"), Unit Case Worker, Michael Allen, Unit Sargent, Department of Corrections et al,<br><br>Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiffs Ronald Peterson, Daniel Kerivan, Thomas Ryan, Thomas M. Hurley, Patrick Burke, William Engleheart, John Shea, Timothy Brady, Clyde Dempsey[1] and James Murphy

---

[1] Plaintiff Clyde Dempsey is now deceased.  See Suggestion of Death, Civil Action No. 93-12725 (Docket Entry 77).

(collectively, the "*Peterson* Plaintiffs") and William M. Tyree\*\*, James Murphy, and Marcus DeAmicis (collectively, the "*Tyree* Plaintiffs") hereby oppose Defendants' Renewed Motion for Summary Judgment.

## I.   INTRODUCTION

The present action is the result of the consolidation of *Tyree v. Weld,* C.A. 93-12260 (the "*Tyree* Action") and *Peterson, et al. v. Dubois, et al.*, [formerly] C.A. No. 93-12725 (the "*Peterson* Action").  The *Tyree* and *Peterson* Plaintiffs are current or former prisoners who were in custody at the Massachusetts Correctional Institution, Cedar-Junction at Walpole ("MCI-Cedar Junction") in 1993, and were indefinitely placed in near solitary confinement and deprived of constitutional and statutory rights without notice or an opportunity to be heard.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Articles I and X of the Massachusetts Declaration of Rights.  *Peterson* First Amended Complaint, Case No. 93-12725, Docket Entry 56, at ¶1 ("Peterson Amended Complaint" or "Amended Compl.").  The *Tyree* Plaintiffs brought additional claims under the 9th and 10th Amendments to the United States Constitution, and the ex post facto clauses, as well as claims for violations of state statutes. *Tyree* Complaint at ¶¶241-248.  All claims arise as a result of Defendants' reclassification of prisoners in August 1993 (the "Phase System"),  in which the *Tyree* and *Peterson* Plaintiffs were removed from the general prisoner population, placed in forced isolation for more than twenty-

---

\*\* Mr. Tyree notified the Court by letter dated November 19, 2007 that he wished to terminate the undersigned as his appointed counsel in this matter, and requested that the Court consider the Summary Judgment papers he submitted pro se on November 19, 2007 (entered on the docket on December 7, 2007 with the date filed listed as November 28, 2007).  To the extent that this Court does not grant his request, we respectfully request that the Court accept this opposition on his behalf, as well.  Mr. Tyree confirmed his assent to this request in an in-person meeting with Attorneys Swift and Moran on December 7, 2007.

A/72359786.1

three hours per day, and denied basic life activities, including: exercise, visitations, library and law library usage, employment opportunity, ability to earn good-time, access to the canteen, hygiene including showering and access to sanitary supplies, religious activities, interaction with other prisoners, telephone use, and the possession of personal effects.  The Phase System imposed deprivations on the *Tyree* and *Peterson* Plaintiffs <u>without</u> <u>notice</u> <u>or</u> <u>an</u> <u>opportunity</u> <u>to</u> <u>be</u> <u>heard,</u> as required by Massachusetts' regulations governing segregation placement.  *See* 103 CMR 421.00 *et seq*.  As such, the deprivations constitute clear violations of constitutional and statutory rights.

Two years later, in 1995, the Phase System was replaced by a system that divided the prison into an East Wing and a West Wing.  The East Wing was more restrictive and included Security Threat Gang ("STG") blocks.  Amended Compl., ¶36; Dec. 20, 2001 Affidavit of Patrick Burke (Exhibit A to Plaintiff's Opposition to Motion to Dismiss or In the Alternative for Summary Judgment, Dec. 20, 2001) (hereinafter, "Burke Aff.") at ¶13.  *See also Haverty v. Comm'r of Correction*, 437 Mass. 737, 741-42 (2002) ("Four of the eight East Wing units . . . house prisoners who have been labeled as gang members").  As of December 20, 2001, at least one Plaintiff remained classified in an STG block without receiving a hearing.  Burke Aff., ¶¶17, 18; Amended Compl., ¶¶43, 44.  *See also Haverty*, 437 Mass. at 748 ("defendants do not provide any procedural protections before a prisoner is housed in the East Wing").

The Massachusetts Supreme Judicial Court (the "SJC") has held that reclassification of prisoners, without a hearing, in the most restrictive Phase, the East Wing, or the associated Security Threat Gang units, violates state regulatory requirements.  *See Haverty*, 437 Mass. at 763.  The SJC did not rule on whether or not the reclassification of prisoners into the most restrictive Phase, the East Wing, or the Security Threat Gang units without a hearing violates the state or federal constitution.  The *Peterson* and *Tyree* Plaintiffs seek a ruling expressly holding that the Defendants' reclassification of prisoners without a hearing into a system that deprives them of the rights and opportunities provided to the general prisoner population, whatever that

-3-

system is called, violates their due process rights.  Unlike the *Haverty* plaintiffs, the *Peterson* and *Tyree* Plaintiffs also seek compensatory and punitive damages, as well as reasonable costs and attorneys' fees, to remedy the constitutional violations arising from the 1993 reclassification and subsequent deprivations imposed by the Department of Corrections ("DOC").

Defendants assert that the individual Defendants are entitled as a matter of law to immunity from civil damages.  Under Supreme Court precedent, no matter how this Court resolves the qualified immunity issue, it must first rule on whether Plaintiffs' allegations show a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Here, the record establishes that Defendants' conduct violated Plaintiffs' clearly established statutory and constitutional rights of which a reasonable person would have known, and that Defendants are not entitled to qualified immunity.  Defendants' renewed Motion for Summary Judgment must therefore be denied.

## II.   PROCEDURAL HISTORY

### A.   THE *PETERSON* AND *TYREE* ACTIONS

The *Peterson* action was originally filed *pro se* on August 31, 1993 (two years before the *Haverty* class action commenced).  *See Original Peterson Complaint*, C.A. No. 93-12725.  On July 27, 2001, the Court appointed present counsel to represent the *Peterson* Plaintiffs.  The *Peterson* Plaintiffs filed their First Amended Complaint on September 7, 2001.  Plaintiffs alleged Defendants had, by depriving Plaintiffs of constitutionally-protected rights under the color of law, violated 42 U.S.C. § 1983, the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Articles I and X of the Massachusetts Declaration of Rights.  The Peterson Amended Complaint seeks compensatory and punitive damages, as well as reasonable costs and attorneys' fees; a declaratory judgment that the conditions of lockdown and segregation systems violated the Massachusetts Declaration of Rights, the U.S. Constitution, and federal and state laws; and an order enjoining Defendants from further violating Plaintiffs' civil rights.

-4-

On November 9, 2001, Defendants moved to dismiss the Peterson Amended Complaint under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56(b).  Specifically, Defendants asserted: (1) that Plaintiffs were members of a class in a class action that presented identical claims and sought identical relief; and (2) that the individual Defendants were entitled as a matter of law to immunity from civil damages.  The Court denied the Defendants' motion.  *See* Sept. 23, 2002 Order, C.A. No. 93-12725, Docket Entry 69. Defendants again moved for summary judgment on September 15, 2003.  *See* C.A. No. 93-12725, Docket Entry 74.

Like *Peterson*, the *Tyree* action was originally filed *pro se* on August 11, 1993.  As in *Peterson*, the *Tyree* Plaintiffs asserted that the 1993 Phase System and subsequent lockdowns and segregation imposed deprivations without notice or an opportunity to be heard in violation of state and federal constitutional and statutory mandates.  *See Tyree* Complaint, C.A. No. 93-12260.

On November 6, 2003, the *Tyree* action was consolidated with the *Peterson* action, with future pleadings to be filed under the case number 93-12260-NG.  *See* Nov. 6, 2003 Order, C.A. No. 93-12725, Docket Entry 82.  Plaintiffs filed a memorandum in opposition to Defendants' September 15, 2003 motion for summary judgment on March 15, 2004.  *See* C.A. No. 93-12725, Docket Entry 83.  The consolidated *Tyree/Peterson* action was stayed, beginning on December 8, 2004, pending resolution of related cases.[2]  Defendants' September 15, 2003 motion for summary judgment remained pending when the stay was entered.  The related cases for which this case was stayed have now been decided, and Defendants have submitted a Renewed Motion for Summary Judgment.

---

[2] The *Gilchrist*, *Longval II*, *Dellelo*, and *Davila* cases discussed herein.

C.     **LITIGATION OF CASES ARISING FROM SIMILAR FACTS**

1.     *HAVERTY* AND *GILCHRIST*

In *Haverty*, plaintiffs, a certified class of MCI-Cedar Junction prisoners, brought an action against the Commissioner of Correction and the Superintendent of MCI-Cedar Junction for violations of statutory and constitutional rights arising from placement in the East Wing following a lockdown in 1995. *Haverty*, 437 Mass. at 739, 741. *Haverty* was consolidated with *Gilchrist v. Commissioner of Correction* on February 16, 2000. *Id.* at 750 n.21. *Gilchrist* was a suit for money damages based on violations of state statutes and regulations and state and federal constitutional rights following the 1993 lockdown and placement in the most restrictive Phase. *Gilchrist v. Comm'r of Correction*, 48 Mass. App. Ct. 60, 60-61 (1999). In 2002, the SJC found in favor of the plaintiffs, holding that the defendants violated state regulations by placing prisoners in the more restrictive units. *Haverty*, 437 Mass. at 763. The court declined to consider the broader constitutional claims presented. *Id.* at 740.

2.     *LONGVAL*

In *Longval v. Commissioner of Correction*, the SJC considered a claim by members of the *Haverty* class that individual DOC employees were liable for monetary damages as a result of the reclassification held unlawful in *Haverty*. *Longval v. Comm'r of Correction*, 448 Mass. 412, 413 (2007). The SJC upheld the Superior Court's dismissal based on qualified immunity, holding that its decision in *Haverty* established that the defendants had violated the plaintiffs' rights, but that the defendants were entitled to qualified immunity because prior to *Haverty* no case had clearly established that the defendants' conduct was unlawful. *Id.* at 422.

3.     *DELLELO* AND *DAVILA*

The First Circuit considered similar claims in *Dellelo v. Maloney*, 1st Cir. Docket No. 05-2205 (Aug. 23, 2007), and *Davila v. Maloney*, 1st Cir. Docket No. 05-2520 (Oct. 2, 2007), actions for money damages brought in federal court by members of the *Haverty* class. The district court granted defendants' motion to dismiss in *Dellelo*, agreeing with the Superior

-6-

Court's decision in *Longval* that "the rights vindicated in *Haverty* were not 'clearly established' at the time giving rise to plaintiffs' claims." *See Dellelo v. Maloney,* June 14, 2005 Order, C.A. No. 00-11813-EFH, at 2.  In *Davila*, the district court granted defendants summary judgment based on qualified immunity, also agreeing with the Superior Court's decision in *Longval*.  *See Davila v. Maloney*, Aug. 29, 2005 Memorandum and Order, C.A. No. 98-10508-DPW, at 4.  The First Circuit separately affirmed both decisions.[3]

## III.   RELEVANT AND UNDISPUTED FACTS

The Defendants' submission does not include a concise statement of material facts as to which they contend there is no genuine issue to be tried (as required by Local Rule 56.1), but instead includes eight pages of "facts" many of which they admit are "merely informative" and not "truly necessary."  Indeed, many of these "facts" are irrelevant and inflammatory, and pages 2 through 10 of the Defendant's submission should be stricken.

The relevant facts pled by Plaintiffs and attested to in previously-filed affidavits can be summarized as follows:[4]

On and before July 12, 1993 MCI-Cedar Junction consisted of three sections, a maximum security end, a minimum security end, and a segregation unit known as DSU (Department Segregation Unit).  Burke Aff., ¶2; Amended Compl., ¶24.  In this alignment, prisoners in both the maximum and minimum ends had access to a number of activities and programs, including but not limited to: nearly unlimited yard time between prisoner counts; the ability to engage in

---

[3] Plaintiffs counsel has been informed that one of the plaintiffs in *Dellelo* has recently petitioned the Supreme Court for writ of certiorari.

[4] Plaintiffs also refer the Court to Plaintiffs' statements of material facts upon which a genuine issue exists to be tried, filed in opposition to Defendants November 9, 2001 and September 15, 2003 motions for summary judgment.  *See* C.A. No. 93-12725, Docket Entries 64 and 84.

prison work, including shop and cafeteria duties; access to the library and law library; the ability to order from the canteen; frequent showers; meals in the chow hall; reasonable visitation from family and friends; and the basic requirements for personal hygiene.  Burke Aff., ¶3; Amended Compl., ¶25.

Chapter 103, section 421.00 *et seq.* of the Code of Massachusetts Regulations sets forth procedural guidelines whereby inmates may be confined to the DSU (the "DSU regulations"). The DSU regulations make clear that a prisoner may not be segregated and denied interaction with other prisoners for nondisciplinary reasons without receiving certain procedural due process protections, including a hearing.  103 CMR §421.07, §421.09.  Amended Compl., ¶¶38-40, 44.

On or about July 13, 1993, as the result of a prison fight, Cedar Junction was "locked down."  Burke Aff., ¶4; Amended Compl., ¶26.  The prison "lockdown" consisted of locking prisoners in their cells for 24 hours a day, except for extremely short and infrequent periods for showers and phone calls.  Burke Aff., ¶5; Amended Compl., ¶27.  Non-Attorney visits were also suspended.  Burke Aff., ¶5; Amended Compl., ¶27.  The lockdown lasted until August 9, 1993. Burke Aff., ¶6; Amended Compl., ¶28.

On or about August 5, 1993, the Commissioner for the DOC implemented the "Phase System" and reclassified 700 Cedar Junction inmates without notice or an opportunity to be heard.  Burke Aff., ¶6; Amended Compl., ¶28.  *See also* Nov. 17, 1995 Plaintiff's Affidavit In Support of Motions for Enlargement, Appointment of Counsel, and Class Certification, at C.A. No. 93-12725, Docket Entry 36 ("Dempsey Aff."), at 3.  The Phase system designated specific sections of the prison as more or less restrictive "Phases."  Burke Aff., ¶7; Amended Compl., ¶30.  Each of the consolidated Plaintiffs in this case was assigned to the most restrictive Phase in July of 1993 without the benefit of any constitutionally-required procedural safeguards.  Burke Aff., ¶¶7, 12; Dempsey Aff. at 3; Amended Compl., ¶35.

The most restrictive Phase consisted of three tiers of 15 prisoners in individual cells. Burke Aff., ¶10; Amended Compl., ¶33.  Prisoners were required to remain in their cells for

-8-

approximately 23 hours per day.  Burke Aff., ¶8; Amended Compl., ¶31.  Their work, canteen, and good-time programs were removed, as well as regular exercise, showers, telephone access, and other privileges.  Burke Aff., ¶8; Dempsey Aff. at 3; Amended Compl., ¶31.  Prisoners were released for one hour a day, for exercise, phone calls, and showers, and had contact only with the other inmates on their tier.  Burke Aff., ¶11; Dempsey Aff. at 3; Amended Compl., ¶34.  They were rarely allowed to speak or visit with prisoners from other cells.  Burke Aff., ¶11; Amended Compl., ¶34.  They were also unable to acquire good time for participation in work, education or other rehabilitative activities.  Burke Aff., ¶9; Dempsey Aff. at 3; Amended Compl., ¶32.  The Plaintiffs were committed to segregation in the most restrictive Phase without a hearing or other procedural safeguards.  Burke Aff., ¶12; Amended Compl., ¶35.

The Phase system remained in effect well into 1995, when it was replaced by the Security Threat Gang ("STG") block system.  Burke Aff., ¶13; Amended Compl., ¶36.  At the same time, the Commissioner of the DOC "closed" the DSU and initiated proceedings to repeal the DSU regulations.  On September 26, 1995, a single justice of the SJC enjoined the repeal of the DSU regulations.  *Haverty,* 437 Mass. at  745-46.

Although Cedar Junction officials claimed to have eliminated the Phase system in 1995, the East Wing and STG system continued the same restrictive conditions that were in place in the most restrictive Phase.  Burke Aff., ¶14; Demspey Aff., at 3; Amended Compl., ¶¶36-38.  Indeed, the restrictions in the STG blocks are identical to those that existed in the most restrictive Phase.  Burke Aff., ¶14, Demspey Aff. at 3; Amended Compl., ¶¶36-38.  Confinement in the most restrictive Phase, the East Wing, or STG is equivalent to placement in a DSU.  Burke Aff., ¶15; Amended Compl., ¶38.  *See also Haverty*, 437 Mass. at 740, 756.

On October 10, 2002, the SJC determined that the East Wing and STG were *de facto* DSUs, and ordered procedural protections guaranteed in DSU regulations to all prisoners before they were housed in the East Wing blocks.  *Haverty,* 437 Mass. at 756, 763.  The SJC noted "the degree of segregated confinement experienced by prisoners in the East Wing is every bit as harsh

-- both in extent and duration -- as confinement in the DSU." *Id*. at 756.   Haverty granted declaratory and injunctive relief to the plaintiffs, holding that "the procedural protections contained in 103 Code Mass. Regs. §§ 421.00 must be afforded to all prisoners before they are housed in DSU-like conditions operating today in the East Wing" (with an exception for new arrivals who may be assigned to the East Wing for a matter of days until they are classified).  *Id*. at 763.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The Court must view the evidence in the light most favorable to Plaintiffs, the nonmoving party, and must draw all reasonable inferences and resolve all doubts over factual issues in Plaintiffs' favor. *Straughn v. Delta Airlines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001).

## IV.   ARGUMENT

**A.    A Motion For Summary Judgment Based On Qualified Immunity Requires The Court To Rule On Whether A Constitutional Violation Has Been Alleged.**

**1.    The Supreme Court Has Held That Application Of The Qualified Immunity Doctrine Must Begin With A Decision On Whether The Plaintiffs' Allegations, Taken In The Light Most Favorable To The Plaintiffs, Show A Constitutional Violation.**

The U.S. Supreme Court, in *Saucier v. Katz*, made explicit the analysis to be undertaken by a court considering the defense of qualified immunity.   The Court held that even if a claim for money damages under § 1983 is dismissed based on qualified immunity, the deciding court must first determine whether the plaintiff has alleged the deprivation of a constitutional right.   533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider . . . this

-10-

threshold question: Taken in the *light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.") (emphasis added).   Otherwise, the qualified immunity doctrine would prevent state actors from ever being made aware of what conduct violates the Constitution.  *Id.*  ("The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.").   The Supreme Court "insist[s] upon turning to the existence or nonexistence of a constitutional right as the first inquiry."  *Id.  See also Wilson v. City of Boston*, 421 F.3d 45, 52 (1st Cir. 2005) (identifying first prong of qualified immunity analysis as "whether the claimant has alleged the deprivation of an actual constitutional right").

> **2.     In *Davila v. Maloney*, The First Circuit Affirmed Dismissal On Qualified Immunity Grounds, But Did Not Rule On Whether The Plaintiff Had Alleged A Constitutional Violation.**

In *Davila v. Maloney* (1st Cir. Docket No. 05-2520), briefed by a pro se inmate, the First Circuit affirmed the dismissal on qualified immunity grounds of federal constitutional claims related to confinement in the East Wing.  Neither the First Circuit, nor the District Court, ruled on whether the plaintiff's allegations showed a violation of constitutional rights.  *See Davila v. Maloney*, Oct. 2, 2007 First Circuit Order, Docket No. 05-2520; Aug. 29, 2005 District Court Order, C.A. No. 98-10508-DPW, Docket Entry 60, at 4.  The First Circuit held that "any right to due process under the circumstances of this case was not clearly established at the time that appellant was transferred to, and housed in, the East Wing."

-11-

3. **Consideration Of Constitutional Issues Is Required.**

   a. **The Court Must Rule On Whether Plaintiffs' Allegations Show A Constitutional Violation, Or The Qualified Immunity Doctrine Will Become A Perpetual License For The DOC To Violate The Constitution.**

Unless the Court rules on whether Plaintiffs' allegations show a constitutional violation, as required by *Saucier*, Plaintiffs will face the risk of continued due process violations.  The absence of a decision on whether the DOC has violated the Constitution allows the DOC to continue to argue that is "unaware" of the due process requirements for classification of prisoners.  Until a court applies the qualified immunity analysis mandated by *Saucier*, "clearly established" law will never be developed.

   b. **The Massachusetts Supreme Judicial Court Has Provided Inmates With No Protection From Continued Due Process Violations.**

Decisions of the SJC demonstrate why it is imperative that this Court adhere to *Saucier*'s qualified immunity analysis and rule that Plaintiffs' allegations show a constitutional violation. While finding the DOC's actions unlawful, the SJC has provided inmates with no future guarantee that they will be provided basic due process before being indefinitely placed in near solitary confinement for non-disciplinary reasons.  The SJC has held that the DOC must provide certain procedural protections to inmates placed in segregated confinement, but it has done so based on the DSU regulations, rather than constitutional due process principles.  *See Haverty*, 437 Mass. at 740, 763 (holding conditions of confinement in East Wing or STG blocks mandated adherence to DSU regulations and finding it "not necessary to reach the constitutional claims").

The SJC has held that an inmate challenging solitary confinement in a unit other than the DSU must "show that there was no dispute of material fact concerning the substantial similarity of the two units." *Longval v. Comm'r of Correction*, 404 Mass. 325, 330 (1989) ("*Longval I*").

-12-

The SJC has been called upon repeatedly to decide whether a segregated confinement unit is similar to the DSU, because the DOC has played a name game with administrative segregation. *See Longval I*, 404 Mass. at 328-29 (considering placement in "Administrative Segregation Units" and observing "[c]ertainly, the department and the commissioner may not sidestep statutory and regulatory provisions . . . by assigning as pretext another name to such a unit."); *Haverty*, 437 Mass. at 756 ("the degree of segregated confinement experienced by prisoners in the East Wing in every material respect is every bit as harsh--both in extent and duration--as confinement in the DSU").

The SJC has also held, however, that even if the DOC places inmates in a unit substantially similar to the DSU, the DOC is entitled to qualified immunity from paying money damages absent previous case law holding that the unit at issue was substantially similar to the DSU.   In *Longval v. Commissioner of Correction*, the SJC held that despite its holding in *Haverty* that placement in the East Wing required adherence to the DSU regulations, the DOC was entitled to qualified immunity from money damages:   "It remained a legitimate factual question . . . whether the *conditions* in the East Wing, under which the plaintiffs were held, sufficiently mirrored those in the former DSU so as to make compliance with the DSU regulations mandatory, as a matter of 'clearly established' State law."   448 Mass. at 422 ("*Longval II*") (emphasis in original).

As this series of cases makes clear, until a court rules that inmates must be given some due process before being indefinitely placed in near solitary confinement, regardless of the label attached to the segregation unit, the DOC can continue to lock inmates in near solitary confinement with impunity.  Further, a repeal of the DSU regulations would leave no established

-13-

case law prohibiting the DOC from indefinitely placing inmates in near solitary confinement without minimum procedural protections.

### 4.    Plaintiffs' Allegations Show A Constitutional Violation.

While the DSU regulations have allowed the SJC to avoid ruling on the constitutional claims raised by inmates placed in segregated confinement, this Court must address the constitutional claims raised here.   Plaintiffs' § 1983 claim, and the instant Motion based on qualified immunity, require the Court to decide as an initial matter whether Plaintiffs' allegations show a constitutional violation.   *See Saucier*, 533 U.S. at 201.   The Court must view the allegations in the light most favorable to Plaintiffs to determine whether a violation of constitutional rights has been shown.   *Id.*

Plaintiffs have alleged that they were placed in near solitary confinement indefinitely for non-disciplinary reasons without notice or an opportunity to be heard.  Amended Compl. at ¶¶28, 35, 40, 44; *Tyree* Compl. at ¶¶37(c), 90.  Plaintiffs have also alleged that while confined in the most restrictive Phase they were required to remain in their cells for approximately 23 hours per day.   Amended Compl., ¶31.   They allege limited access to the law library, to showers, to exercise, to work (and the associated good-time credits that they could earn), and to human contact.  Each one of these deprivations is significant and atypical.  Furthermore, prisoners must be provided with "adequate law libraries or adequate assistance from persons trained in the law". *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977).   Denial of access to law libraries based upon housing classifications violates the First Amendment.   *LaPlante v. Commonwealth of Mass. Dept. of Correction et. al*, Memorandum and Order Re: Cross Motions for Summary Judgment, C.A. No. 01-10186 (Jan. 31, 2003).   This denial does not need to actually injure any of the Plaintiffs in order to amount to a constitutional violation.   *See Felton v. Lincoln*, 429 F. Supp. 2d

-14-

226, 240 n.7 (D. Mass. 2006), citing *Ferreira v. Duval*, 887 F. Supp. 374, 381 (D. Mass. 1995) and *Sowell v. Vose*, 941 F.2d 32, 34-35 (1st Cir. 1991) (where the challenge is "systemic" or "the conditions challenged obviously go to the heart of any meaningful access to libraries, counsel, or courts" no actual injury need be alleged).  And the denial of exercise for a significant period of time "without a legitimate penological justification is sufficient to state a prima facie Eighth Amendment claim." *LaPlante*, *supra*, at 13 (internal citations omitted).  The Plaintiffs here have alleged significant deprivations implicating constitutional rights.  They are entitled to procedural protections.

> a.    **Applying The Standard Announced In *Sandin v. Conner*, Plaintiffs Have Alleged Deprivation Of A Liberty Interest Without Minimal Due Process.**

The Supreme Court's decision in *Sandin v. Conner* provides that state policies or regulations can create a liberty interest in avoiding additional restraint while in confinement, if the restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  515 U.S. 472, 484 (1995).  In announcing the "atypical and significant hardship" standard, the Court expressly overruled prior case law holding that state regulations or policies alone could create a liberty interest.  *Id.* at 483-84.  The Court called for a return to the standard established by *Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974), providing that due process inquiries in the prison context require an "intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due."  *Id*. at 478, 483-84.

Here, Massachusetts regulations entitled Plaintiffs to certain procedural protections before being placed in the most restrictive Phase, East Wing, or STG blocks, with conditions of confinement that imposed an atypical and significant hardship.  Under *Sandin*, Plaintiffs therefore had a liberty interest in avoiding placement in the most restrictive Phase, East Wing, or

-15-

STG blocks.  Further, the balancing called for by *Sandin* and *Wolff* was not provided here, as Plaintiffs were provided with *none* of the procedural protections called for by the Massachusetts regulations or otherwise required by the most minimal due process standards.

> **b.**  **The First Prong Of *Sandin* Is Met By The Failure To Adhere To Regulations Governing Placement In Segregated Confinement.**

Here, the first prong of *Sandin*'s due process inquiry is satisfied because state regulations governed placement in segregated confinement.  As the SJC held in *Haverty*, Massachusetts's DSU regulations required Defendants to provide procedural protections before placing inmates in the most restrictive Phase, the East Wing, or STG blocks.  Defendants do not dispute that they failed to adhere to the regulations.  They have argued instead that the regulations did not apply to placement in the most restrictive Phase, East Wing, or STG blocks.  *Haverty*, 437 Mass. at 739 ("defendants contend that the DSU at Cedar Junction has been abolished and the DSU regulations are therefore no longer of any force or effect").  The next step under *Sandin* is the consideration of whether the additional restraint governed by the regulations amounted to an "atypical and significant hardship" on Plaintiffs.  *Sandin*, 515 U.S. at 484.

> **c.**  **The Second Prong Of *Sandin* Is Satisfied Because The Confinement Here Amounted To An Additional Restraint That Imposed An Atypical And Significant Hardship On Plaintiffs.**

As in *Haverty*, the Defendants do not challenge Plaintiffs' characterization of the conditions of confinement at issue here.  *Haverty*, 437 Mass at 751 ("defendants do not dispute the facts concerning the conditions of confinement in the various housing areas of Cedar Junction or in the former DSU").  Unlike the plaintiff in *Sandin*, Plaintiffs here were placed in near solitary confinement not for 30 days, not as punishment for something they did, and not following a hearing.  *Sandin,* 515 U.S. at 475-76.  Instead, like the plaintiffs in *Haverty*,

-16-

Plaintiffs allege that they were placed in near solitary confinement for an indefinite period as part of the prison's reclassification.  *See Haverty*, 437 Mass at 744 ("prisoners in the East Wing are locked up in the near solitary confinement conditions . . . effectively indefinitely"); *see also* Defendants' Memorandum of Law in Support of Their Renewed Motion for Summary Judgment at 17 ("Plaintiffs' claims here are identical to those claims already asserted and already adjudicated . . . in [*Haverty*]. . . .  however, plaintiffs here seek money damages.").  The SJC noted in *Haverty* that "[a]n uncontested representative sampling of the plaintiff class shows that the 200 longest stays in the East Wing averaged 456.1 days; the fifty longest, 739.8 days; the twenty longest, 890.5 days; and the ten longest 981.0 days." *Id.* at 744 n.15.  Such indeterminate placement in near solitary confinement is certainly not "within the range of confinement to be normally expected" by Plaintiffs.  *Sandin*, 515 U.S. at 487.

As this Court has observed, solitary confinement amounts to a type of "psychological torture." *Kane v. Winn*, 319 F. Supp. 2d 162, 207 (D. Mass. 2004).  In *Kane*, the Court cited studies showing that "solitary confinement commonly leads to symptoms such as 'perceptual distortions, hallucinations, hyperreponsivity to external stimuli, aggressive fantasies, overt paranoia, inability to concentrate, and problems with impulse control.'" *Id.* (citing *Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) and reports cited therein).  Further, the impact of indefinite placement in near solitary confinement on Plaintiffs was the same whether it was for administrative or disciplinary reasons.

> **d.**   **Plaintiffs Had A Liberty Interest In Avoiding Indefinite Placement In Near Solitary Confinement, And Did Not Receive Any Due Process Before Being Deprived Of That Liberty Interest.**

The DSU regulations, together with the conditions of confinement in the segregated units to which the DSU regulations have been held to apply, create a liberty interest in avoiding that

-17-

confinement.   As a result, Plaintiffs were entitled to due process.   Instead, Plaintiffs were provided with no notice or opportunity to be heard before being indefinitely placed in near solitary confinement.   This total lack of procedure before the deprivation of a liberty interest amounts to a clear violation of the Fourteenth Amendment.

As the Supreme Court made clear many years ago, long before the confinement at issue here, inmates cannot be completely deprived of due process.   *See Wolff*, 418 U.S. at 555-56 ("a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country."). Instead, the <u>amount</u> of due process afforded an inmate depends on "a balancing of the interests affected by the relevant government action."   *Superintendent, Mass. Correctional Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985) (holding that due process requires that revocation of good time credits be "supported by some evidence in the record").   In *Wolff*, the Supreme Court observed that the "*some kind of hearing is required* at some time before a person is finally deprived of his property interests."   *Wolff*, 418 U.S. at 557-58 (emphasis added).   The Court went on to say that, like a property interest, "a person's liberty interest is equally protected, even when the liberty itself is a statutory creation of the State.   The touchstone of due process is protection of the individual against arbitrary action of government."   *Id*. at 558.

In *Wolff*, the Supreme Court noted that "solitary confinement . . . represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct."   *Id.* at 572 n.19.   In *Sandin*, the Supreme Court held that "[t]he regime to which [the plaintiff] was subjected *as a result of [his] misconduct hearing* was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life."   515 U.S. at 487 (emphasis added).   Conversely,

-18-

Plaintiffs here were provided no "protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558. Plaintiffs' allegations therefore show a constitutional violation, even if the Court rules that Defendants are entitled to qualified immunity.

**B.** **Qualified Immunity Does Not Protect Defendants Because Existing Case Law Clearly Established That Indefinite Placement In Segregation Without Procedural Protections Violated Due Process Rights.**

In addition to showing a constitutional violation, Plaintiffs' allegations show a violation of constitutional rights as established by case law existing when the confinement at issue here took place. Defendants are therefore not entitled to qualified immunity. In *Wolff*, as discussed above, the Supreme Court noted that "solitary confinement . . . represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct." *Wolff*, 418 U.S. at 572 n.19. The Court also observed that "some kind of hearing is required" before an inmate is deprived of a liberty interest. *Id.* at 557-58. *Sandin*, while clarifying in 1995 the standard for determining whether a liberty interest exists, called for a "return to the due process principles . . . correctly established and applied in *Wolff*." *Sandin*, 515 U.S. at 483. Supreme Court case law had therefore clearly established as early as 1974 that some kind of hearing is required before an inmate is placed in solitary confinement. The First Circuit had also held that some due process is required when inmates are placed in more restrictive confinement. *See Carlo v. Gunter*, 520 F.2d 1293, 1297 (1st Cir. 1975) ("while an emergency may justify postponement of due process . . . the *minimal procedures* must be granted at the earliest practicable opportunity thereafter.") (emphasis added). Furthermore, in 1988, the Suffolk Superior Court held that the commitment of an inmate to the DSU at MCI-Cedar Junction without compliance with the DSU regulations violated due process rights as a matter of law. *See Hoffer v. Comm'r of Correction*, 412 Mass. 450, 452-53 (Mass.

-19-

1992) (discussing lower court proceedings).  Money damages were awarded to the plaintiff as a result of this violation.  *See id.*

In light of this case law, Defendants cannot reasonably argue that in 1993 it had not been clearly established that indeterminately placing an inmate in near solitary confinement without notice or an opportunity to be heard would violate due process.  Defendants might have been entitled to qualified immunity had they provided Plaintiffs with *some* due process because they could legitimately argue that then-existing case law did not establish *what* due process was owed Plaintiffs.  They cannot legitimately argue, however, that existing case law did not make clear that the Constitution would be violated if an inmate was indefinitely placed in near solitary confinement with *no* due process.  *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").  By 1993, *Wolff* had made readily apparent the unlawfulness of denying Plaintiffs any due process before placing them in the most restrictive Phase, East Wing, or STG block.  Defendants' motion for summary judgment based on qualified immunity should therefore be denied.

-20-

## V.   CONCLUSION

For all of the reasons stated herein, Defendants' Motion for Summary Judgment must be denied.

For the Plaintiffs,

William M. Tyree, Jr.\*\*, James Murphy, Marcus DeAmicis,

Ronald Peterson, Daniel Karivan, Thomas Ryan, Thomas M. Hurley, Patrick Burke, William Engleheart, John Shea, Timothy Brady, and James Murphy

By Their Attorneys

/s/ Michael C. Moran
Douglas T. Schwarz, BBO # 548558
Corin R. Swift, BBO # 647672
Michael C. Moran, BBO # 666885
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated:  December 20, 2007

-21-

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 20, 2007.

/s/ Michael C. Moran