## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WILLIAM M. TYREE, JR., et al.,** ) | |
|     **Plaintiffs,** ) | |
| ) | |
|     **v.** ) | **Civ. No. 93cv12260-NG** |
| ) | **LEAD DOCKET NO.** |
| **WILLIAM F. WELD, et al.,** ) | |
|     **Defendants.** ) | |

| | |
|---|---|
| RONALD PETERSON, et al., ) | |
|     Plaintiffs, ) | |
| ) | |
|     v. ) | Civ. No. 93cv12725-NG |
| ) | CONSOLIDATED |
| LARRY DUBOIS, et al., ) | ACTION |
|     Defendants. ) | |

**GERTNER, D.J.**:

## TABLE OF CONTENTS

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
January 11, 2010

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
        A.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
        B.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
             1.   Tyree v. Weld, No. 93-cv-12260-NG . . . . . . . . . . . . . . . -7-
             2.   Peterson v. Dubois, No. 93-cv-12725-NG . . . . . . . . . . . -8-
             3.   The Consolidated Actions . . . . . . . . . . . . . . . . . . . . . . . -8-

II.   LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        A.   Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        B.   Standards for a Procedural Due Process Violation . . . . . . . . . . . . . . -11-

III.   PREVIOUS LITIGATION OVER THE CEDAR JUNCTION CLASSIFICATION
     SYSTEMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        A.   Summary of Previous State Court Litigation . . . . . . . . . . . . . . . . . . . -14-
             1.   Gilchrist v. Commissioner of Corrections . . . . . . . . . . -14-
             2.   Haverty v. Dubois . . . . . . . . . . . . . . . . . . . . . . . . . -15-
             3.   Longval v. O'Toole . . . . . . . . . . . . . . . . . . . . . . . . . -17-
        B.   Summary of Previous Federal-Court Litigation: Dellelo and Davila . -18-
             1.   Dellelo v. Maloney . . . . . . . . . . . . . . . . . . . . . . . . . -18-

2.      Davila v. Maloney . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

C.      The Binding Effect of the Federal-Court Litigation . . . . . . . . . . . . . . -20-

IV.     ANALYSIS OF THE PLAINTIFFS' LIBERTY INTEREST . . . . . . . . . . . . . . . . . . . -21-

V.      THE MATHEWS BALANCING TEST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

VI.     QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

VII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **WILLIAM M. TYREE, JR., et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 93CV12260-NG** |
| | ) | **LEAD DOCKET NO.** |
| **WILLIAM F. WELD, et al.,** | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| RONALD PETERSON, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 93CV12725-NG |
| | ) | CONSOLIDATED |
| LARRY DUBOIS, et al., | ) | ACTION |
| Defendants. | ) | |

GERTNER, D.J.:

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### January 11, 2010

These civil rights actions arise from serious allegations that prisoners held in a

maximum-security prison were placed in solitary or near-solitary confinement for an indefinite

duration and without due process of law.  Plaintiff prisoners[1] seek damages for the past

violations of their constitutional rights.  Where damages are sought, however, the defendants

have a right to defend by claiming qualified immunity because "their conduct [did] not violate

clearly established statutory or constitutional rights of which a reasonable person would have

---

[1] The plaintiffs are William M. Tyree, Jr., Ronald Peterson, James Murphy, Marcus DeAmicis, Daniel Karivan, Thomas Ryan, Thomas M. Hurley, Patrick Burke, William Engleheart, John Shea, Timothy Brady, Clyde Dempsey, and James Murphy.  They are collectively referred to simply as "the plaintiffs."

known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Defendants[2] here have raised a claim

of qualified immunity and have sought summary judgment on the issue.

After years of litigation on virtually identical claims, the basic facts of the case are not

The issue then is not simply whether the defendants did or did not violate the plaintiffs'

rights in failing to provide due process safeguards when they were transferred to significantly

more restrictive conditions.  That question has already been decided in prior litigation on state

grounds and is categorically reaffirmed here on federal constitutional grounds:  Defendants *have*

violated plaintiffs' rights.  The issue is more complex:  To secure damages, the rights in question

must also have been sufficiently well-established in the courts at the time of the violation that a

reasonable person in the defendants' shoes would have been aware of them.  Given the torturous

history of prison conditions litigation in both federal and state courts, the Court cannot conclude

that they were.

Following a hearing on the issue, and substantial briefing, defendants' Motion for

Summary Judgment (document #91) is GRANTED.[3]

## I.    BACKGROUND

### A.    Facts

After years of litigation on virtually identical claims, the basic facts of the case are not

substantially disputed.

---

[2] There are numerous defendants named in the suit, including former Governor William F. Weld, Commissioner Larry Dubois, and Superintendent Ronald Duval.  They are sued in both their official and individual capacities.  See, e.g., Compl. ¶ 7, Tyree v. Weld, No. 93-cv-12260 (document #5).  Insofar as the suits are against the defendants in their official capacities, the Court takes the defendants to be the individuals currently holding those positions.  See Fed. R. Civ. P. 25(d).

[3] Plaintiff William Tyree has also filed a Motion for Partial Summary Judgment on the question of defendants' immunity (document #87).  That motion is DENIED for the reasons set out in this decision.

When this litigation began, the State of Massachusetts maintained only one maximum-security facility for prisoners, the Massachusetts Correctional Institution at Cedar Junction in Walpole, Massachusetts ("Cedar Junction").  Defs.' Statement Material Facts ¶ 3 (document #100);Haverty v. Comm'r of Corr. (Haverty II), 776 N.E.2d 973, 977 (Mass. 2002), aff'g in part Haverty v. Dubois (Haverty I), No. 953634F, 11 Mass. L. Rptr. 252, 1999 WL 1487591 (Mass. Super. Ct. Oct. 13, 1999).[4]  Cedar Junction was organized around two different sections, now generally referred to as the East Wing and the West Wing.  Inmates in both wings were subjected to solitary confinement:  The West Wing had three housing units with 72 one-person cells each; the East Wing had eight housing units with 45 one-person cells each.  Prior to August 1993, each Wing also had a departmental segregation unit ("DSU") where prisoners were placed for discipline, or pending the outcome of a disciplinary hearing.  Regulations required that prisoners be given procedural protections before being placed in a DSU.  Haverty II, 776 N.E.2d at 975.  There were no comparable procedural protections for placement in either the East or the West Wing.

In the early 1990s, Cedar Junction was the scene of inmate violence.  A series of altercations among the prisoners culminated in July 1993, when several inmates were seriously injured.  See Haverty v. Maloney, No. 95-3634-F, slip op. at 4-6 (Mass. Super. Ct. Feb. 7, 2003).  The prison officials decided to "lock down" Cedar Junction, which meant restricting some aspects of normal prison operation.  Gilchrist v. Comm'r of Corr., 717 N.E.2d 279, 281 (Mass. App. Ct. 1999).  Shortly after this first lockdown, prison officials created a three-tiered

---

[4] Throughout this opinion, the Court refers to documents that were filed after consolidation by reference to a document number within the Tyree v. Weld docket, No. 93-cv-12260-NG, as with the Defendants' Statement of Material Facts cited here.  By contrast, if a document was filed before the consolidation of the two member cases, Tyree v. Weld and Peterson v. Dubois, it is cited with reference to the original docket number to ensure clarity in the procedural history.

classification system.  See Defs.' Statement Material Facts ¶ 12 (document # 100).  It is referred

to herein as the "Phase System."  Each "Phase" of classification permitted prisoners "different

degrees of mobility, access to programs, and other privileges."  Gilchrist, 717 N.E.2d at 281.

Phase I was the least restrictive, Phase II intermediate, and Phase III the most restrictive.  Id.;

accord MCI-Cedar Junction Inmate Orientation Handbook, Ex. C to Defs.' Mem. Law in

Support Renewed Mot. Summ. J. [hereinafter "Defs.' Br."] (document #92).  Contra Dep. of

Ronald T. Duval at 22, Ex. A to Defs.' Br. ("Phase I was the most restrictive . . . .").[5]  Inmates

were classified based on behavior; the theory was that the most disruptive inmates would be

restrained and good conduct would thereby be encouraged.  Gilchrist, 717 N.E.2d at 281.  The

new system essentially rendered obsolete the previous use of the DSUs to discipline unruly

inmates.  Id. at 282.

     As the Phase System was implemented and the inmates were classified, the plaintiffs in

these cases filed suit.  See Compl., Tyree v. Weld, No. 93-cv-12260 (document #5); Compl.,

Peterson v. Dubois, No. 93-cv-12725 (document #12).  Each suit alleged that the assignment to a

restrictive classification without a hearing violated the plaintiffs' due process rights.

     The parties' accounts diverge as to what the conditions of confinement actually were

under the Phase System.  The defendants, not surprisingly, minimize the restrictions.  They claim

that each week inmates in Phase III were permitted two social visits, $20.00 in canteen funds,

and one period, by appointment, in the law library.  And although they were in solitary

---

[5] The confusion is understandable.  It appears that when a subsequent classification program was instituted in 1995 (as discussed below), Phase I was the most restrictive, reversing the order of the 1993 Phase System.  To avoid confusion, the discussion of the subsequent classification system will avoid using the term "Phase."  The most restrictive confinement under the Phase System is referred to as "Phase III."  See also Pls.' Resp. to Defs.' Statement Material Facts ¶ 15 (document #101) (noting discrepancies).  Whatever the name, the plaintiffs allege that they were placed in the most restrictive area.

confinement, they were provided approximately 90 minutes of out-of-cell time each day.  Defs.'
Br. at 5 (document # 92) (citing MCI-Cedar Junction Inmate Orientation Handbook, Ex. C to
Defs.' Br.).

The plaintiffs do not contest that the privileges cited by the defendants could be found in
the MCI-Cedar Junction Inmate Orientation Handbook.  See Pls.' Resp. to Defs.' Statement
Material Facts ¶ 16 (document #101).  Rather, plaintiffs claim that they were illusory, and in any
case do not affect their central claim, that solitary confinement in Phase III violated their
constitutional rights.  See generally Pls.' Resp. to Defs.' Statement Material Facts (document
#101).  Handbook or no handbook, Phase III prisoners were "placed in forced isolation for more
than twenty-three hours per day, and denied basic life activities, including: exercise, visitations,
library and law library usage . . . [and] access to the canteen."  Pls.' Mem. Opp. Defs.' Renewed
Mot. Summ. J. at 2-3 (document #96).  The plaintiffs filed suit while the Phase System was in
force.

Despite the new system, disturbances continued.  On April 3, 1995, a prison guard was
injured when inmates assaulted him.  Prison authorities again locked down Cedar Junction.
When the lockdown was lifted in July 1995, the officials instituted still another system of
restrictions.  Haverty II, 776 N.E.2d at 976, 979.  To distinguish this classification scheme from
the one instituted in 1993, the Court refers to it as the "Security Threat Group System" or "STG
System."

There were at least two differences between the STG System and the Phase System,
though it is not clear that they are material to this case.  See Gilchrist, 717 N.E.2d at 280 n.4
("Regarding the reduction to two levels of restriction, . . . it had resulted in only minor
alterations.").  First, under the STG System, prisoners who were involved in "security threat

groups" (i.e., gangs) would be "subject to transfer to restrictive housing."  Haverty II, 776

N.E.2d at 976 & n.7.  The second change was that the three tiers of classification that had existed

in the Phase System were reduced to two: the West Wing would have more liberal conditions for

inmates, and the East Wing more restrictive.  See Pls.' Resp. to Defs.' Statement Material Facts

¶¶ 23-24 (document #101).  Restrictive confinement under the STG System is referred to as

assignment to the "East Wing" or "the STG Blocks."  Inmates housed in the East Wing were

those who were arriving for initial evaluation, inmates from other institutions who required more

restrictive confinement, and inmates who had been identified as members of a security threat

group.  Defs.' Statement Material Facts ¶¶ 25-27 (document #100); Haverty II, 776 N.E.2d at

767 (Cordy, J., dissenting).

The Peterson plaintiffs amended their complaint in 2001 to include additional factual

allegations arising from the security threat group classification system.  See 1st Am. Compl. ¶¶

36-45, Peterson v. Dubois, No. 93-cv-12725 (document #56).  Nevertheless, their legal theory

remained unchanged; they continued to allege that assignments to high security classifications

were made without due process.  See id. ¶¶ 46-49.

## B.    **Procedural History**

This case is the consolidation of two separate actions: Tyree v. Weld, No. 93-cv-12260-

NG, and Peterson v. Dubois, No. 93-cv-12725-NG.  For clarity, the Court traces first Tyree's

procedural history to the point of consolidation, then Peterson's, then that of the consolidated

civil action.

1.     **Tyree v. Weld, No. 93-cv-12260-NG**

The Tyree action was filed pro se in October 1993, charging that the prisoners'

assignments to Phase III without a hearing violated their constitutional right to due process.[6]  By

February 8, 1994, each Tyree defendant had moved for summary judgment.  The Court,

concluding that the complaint raised serious and important constitutional questions, ordered sua

sponte that counsel be appointed for the plaintiffs on January 22, 1997.  On January 27, 1997,

without ruling on the pending summary judgment motions, the Court stayed the case pending the

resolution of Gilchrist v. Dubois, then a recently appealed Massachusetts Superior Court case.

The stay remained in effect for more than five years.

In November 2002, the plaintiffs moved to lift the stay, to amend the complaint, and for

summary judgment.  The defendants did not immediately respond, perhaps because the plaintiffs

served their documents to an outdated address.  See Letter from Maryellen Molloy, Clerk, to

Nancy White, General Counsel, Dep't of Corr. (May 19, 2003), Tyree v. Weld, No. 93-cv-12260

(document #37).  When they did respond, in July 2003, the defendants moved to consolidate

Tyree with Peterson v. Dubois, then pending in front of Judge Wolf of this Court.  The plaintiffs'

motions were administratively terminated as moot pending the decision on the Motion to

Consolidate.  See Electronic Order of August 29, 2003, Tyree v. Weld, No. 93-cv-12260.  The

Motion to Consolidate was granted on November 6, 2003.

---

[6] Notably, although the Tyree plaintiffs once moved to amend their complaint, they have never done so.
See Mot. Amend, Tyree v. Weld, No. 93-cv-12260 (document # 33).  The Court terminated the motion as moot on
August 29, 2003, noting "motion[] to be revisited after decision has been made on the motion to consolidate with
[the Peterson case]."  The Motion to Amend was never addressed on its merits, nor did plaintiffs refile it.  Thus, the
Tyree plaintiffs' complaint is, on its face, limited to alleged due process violations arising out of the Phase System.
See generally Compl., Tyree v. Weld, No. 93-cv-12260 (document #5).

### 2.     Peterson v. Dubois, No. 93-cv-12725-NG

Peterson also began with a pro se complaint, filed in December 1993.  The defendants were not served until the spring of 1995.  On the plaintiffs' motion, they were assigned counsel in June 1995.  In October 1995, the defendants moved to dismiss, and in November, the plaintiffs moved for class certification.  In November and December 1999, one plaintiff, William Engleheart, twice moved for judgment.  The dispositive motions and the motion for class certification were denied without prejudice on August 7, 2001.

On September 10, 2001, as noted above, the Peterson plaintiffs filed an amended complaint.  They added factual allegations related to the STG System's classification mechanisms, but also retained their previous charges pertaining to the Phase System.  In November 2001, the defendants moved to dismiss or, in the alternative, for summary judgment; the motion was denied in September 2002 after a hearing.  Judge Wolf noted that discovery was required before a decision on qualified immunity could be made.  See Order of Sept. 23, 2002, Peterson v. Dubois, No. 93-cv-12725.

On the parties' joint motion, the case was then stayed pending resolution of Haverty II by the Massachusetts Supreme Judicial Court ("SJC").  After Haverty II was decided, the defendants again moved for summary judgment on qualified immunity grounds.  The Court then consolidated Peterson with Tyree, which was the earlier-filed action, and the outstanding motions in Peterson were terminated as moot with instructions to re-file them in Tyree, which was designated as the lead action.

### 3.     The Consolidated Actions

After the cases were consolidated, the parties jointly moved to stay proceedings pending a final resolution in Gilchrist v. Dubois.  On April 28, 2005, the Court ordered further briefing

on the status of <u>Gilchrist</u> and the effect, if any, of <u>Longval v. O'Toole</u> (<u>Longval II</u>), No. 98-2072, 19 Mass. L. Rptr. 308, 2005 WL 910722 (Mass. Super. Ct. Jan. 28, 2005), then recently decided in the Massachusetts Superior Court.  It also set a hearing for early June 2005.

The hearing date was repeatedly continued on joint motion of the parties until September 2007.  In May 2007, plaintiff William Tyree announced that he would be representing himself from that point forward, and filed a motion for partial summary judgment on qualified immunity (document #87).  And in November 2007, the defendants filed the instant motion for summary judgment on qualified immunity grounds (document #91).  After additional briefing, the Court held a hearing on the defendants' summary judgment motion.

## II.   <u>LEGAL STANDARDS</u>

Summary judgment may only be granted where, considering the evidence as a whole, there is no genuine issue of material fact left for trial.  A court considering a motion for summary judgment must consider the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  <u>See, e.g.</u>, <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 42 (1st Cir. 1999).

### A.   <u>Qualified Immunity</u>

Where, as here, damages are sought, the defendants have a right to claim that they are entitled to qualified immunity because "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The doctrine reflects a concern that imposing liability on the defendants would be unfair if the defendants had no reason to know when they acted that they would held liable.  It also reflects a concern that the threat of litigation could hinder

government operations, creating an incentive for government officials to take no action rather than risk a lawsuit.

The First Circuit recently clarified that the qualified immunity inquiry involves a two-part test.  The "court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009)).  In turn, the "clearly established" prong "has two aspects" -- one focusing on the clarity of the law and the other on the application of the law to the facts.  Id.  The law at the time of the alleged civil rights violation must have been clear, and it must be the case that, given the facts, a reasonable official in the defendants' position would have understood his conduct to be unlawful.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

Here, determining the state of the law at the time defendants acted is complicated by the intervention of the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995).  Plaintiffs' claims relating to the 1993 Phase System pre-date Sandin; their claims relating to the 1995 Security Threat Group System post-date it.  Sandin effected an important change in the way that judges were to analyze the *first* step of the qualified immunity inquiry in a prison conditions case -- the question of whether a constitutional violation occurred at all.  But since the *second* step of the qualified immunity inquiry looks to the state of the law *at the time* of the violation, Sandin is only relevant to the Court's qualified immunity analysis for the system that followed it, the 1995 STG System, not the 1993 Phase System.  See Tellier v. Fields, 280 F.3d 69, 80 n.4 (2d Cir. 2000) (holding that while "Sandin applies retroactively to the question of

whether [the plaintiff] has alleged a liberty interest . . . [it] is not relevant to the qualified

immunity analysis"); see also Anderson, 483 U.S. at 640 ("[I]n the light of *pre-existing* law the

unlawfulness must be apparent." (emphasis added)); Magluta v. Samples, 375 F.3d 1269, 1284

(11th Cir. 2004) (adopting Tellier's approach); Carlo v. City of Chino, 105 F.3d 493, 501 n.2

(9th Cir. 1997) (noting that Sandin does not alter the qualified immunity calculus for actions

taken before it was decided); Lee v. Coughlin, 26 F. Supp. 2d 615, 637-38 (S.D.N.Y. 1998).

### B.    Standards for a Procedural Due Process Violation

A plaintiff who seeks to demonstrate a procedural due process violation must prove two

elements.  First, the plaintiff must show that the defendant deprived him of a constitutionally

protected interest.  Second, if the Court concludes that the defendant did deprive the plaintiff of a

constitutionally protected interest, the Court must examine whether the procedures followed in

connection with the deprivation satisfy the demands of the Due Process Clause.  See, e.g.,

Wilkinson v. Austin, 545 U.S. 209, 221, 224 (2005).

In this case, Sandin determines whether the plaintiffs had a liberty interest in avoiding

more restrictive conditions of confinement.  As described above, while Sandin was decided after

the 1993 Phase System was implemented and shortly before the 1995 STG System was

implemented, it is fully retroactive and therefore applies to all claims. See Dominique v. Weld,

73 F.3d 1156, 1160 n.6 (1st Cir. 1996).

Sandin changed the way courts examine due process challenges to prison conditions.

Prior to Sandin, the Supreme Court recognized that a prisoner had a liberty interest in avoiding

restrictive conditions that could only be imposed if certain substantive predicates set forth in a

statute or regulation were established.  Sandin, 515 U.S. at 480.  For example, the Court held in

Hewitt v. Helms that a state prisoner had a constitutionally protected liberty interest in avoiding

administrative segregation since state statutes and regulations provided that a prisoner could be placed in restrictive confinement only if certain procedures were followed and officials determined that the prisoner posed a serious threat to prison security.  459 U.S. 460, 470-72 (1983); see also Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (holding that, where a state creates a right and recognizes that it can only be deprived as a result of serious misconduct, a prisoner's interest "is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures . . . required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated").

Sandin rejected this approach but only to a degree: It rejected Hewitt's holding that "the use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 463 (1989) (quoting Hewitt, 459 U.S. at 472).  According to the Court, permitting claims based on apparently mandatory language in state statutes or regulations extended prisoners' rights too broadly to allow for the flexible maintenance of prisons and the states' broad discretion in administering them.  See Sandin, 515 U.S. at 482-83.  But the Court surely did not create a per se rule in the other direction -- i.e., that regulations are *never* relevant to the question of whether the State created a liberty interest. Rather, whether state regulations did or did not do so depends upon the circumstances.  Id. at 484 (noting that regulations and statutes "may under certain circumstances create liberty interests which are protected by the Due Process Clause").[7]

_____

[7] To be sure, in certain, limited situations, the Due Process Clause itself confers a liberty interest, even in the absence of a state statute or regulation.  See, e.g., Vitek v. Jones, 445 U.S. 480, 491-94 (1980) (holding that a state prisoner had a liberty interest in avoiding an involuntary transfer to a mental hospital for psychiatric treatment, regardless of whether that interest was protected by state law); see also Sandin, 515 U.S. at 479 n.4.  No such liberty interest is implicated in this case.  If plaintiffs had a constitutionally protected interest in avoiding assignment to

Sandin shifted the focus of a court's inquiry from the language of state regulations to the magnitude and nature of the loss suffered by the prisoner.  See id. at 480-84.  Whether a restrictive condition imposed on a prisoner implicates a liberty interest depends upon whether the restraint "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id. at 484.  While the standard's language is less than clear, its jurisprudential purpose is evident: The "atypical and significant" standard, according to the Court, is necessary to restore deference to prison administrators who were previously subject to lawsuits any time a disgruntled prisoner could point to seemingly mandatory language in a prison regulation.  Id. at 482-83.[8]

If a liberty interest exists, courts analyze the procedural protections afforded the prisoner under the familiar Mathews v. Eldridge balancing test.  424 U.S. 319 (1976); see also Wilkinson, 545 U.S. at 224-25 (holding that Sandin only affects whether a liberty interest is present or not, and applying the Mathews test).  The framework requires the Court to weigh three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

Phase III or the East Wing, that interest must have been conferred by a Massachusetts statute or regulation.

[8] One author has suggested that the Court has swung the pendulum too far in the opposite direction, excusing prison officials from affording minimal procedural protections before placing inmates in most segregatory living arrangements:

> Today, it is clear that prison officials have the power to sentence prisoners to segregatory living arrangements for either punitive or non-punitive reasons, without following any procedural standards whatsoever.  State and federal prison guidelines outlining such procedures can be violated without concern: because prisoners possess no liberty interest in staying out of such confinements, courts will rarely if ever examine the constitutionality of the procedures prison officials utilize.

Michael Z. Goldman, Note, Sandin v. Conner and Intraprison Confinement: Ten Years of Confusion and Harm in Prisoner Litigation, 45 B.C. L. Rev. 423, 425 (2004) (footnotes omitted).

> finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.  If, considering these factors, the plaintiff should have received more

procedural protections for the liberty interest, his right to procedural due process has been

violated.

## III.   PREVIOUS LITIGATION OVER THE CEDAR JUNCTION CLASSIFICATION SYSTEMS

### A.   Summary of Previous State Court Litigation

As noted above, these issues have already been extensively litigated in state court.  Since

these cases and their holdings are highly relevant, the Court summarizes them in some detail.

### 1.   Gilchrist v. Commissioner of Corrections

Lonnie Gilchrist filed suit in 1993 after being classified as a Phase III prisoner at Cedar

Junction.  Gilchrist v. Comm'r of Corr., 717 N.E.2d 279, 280 (Mass. App. Ct. 1999).  His claims

apparently turned entirely on the Phase System.  He claimed that the defendants' failure to afford

him a pre-classification hearing violated his procedural rights under state regulations, state

statutes, the Massachusetts Constitution, and the United States Constitution.  Id.  Gilchrist sought

both injunctive relief and damages.

On cross-motions for summary judgment, the trial court determined that the Department

of Correction had violated its own regulations and Gilchrist's right to procedural due process by

failing to give Gilchrist a hearing.  Id.  It reasoned by analogy to the use of a DSU before 1993:

because the two types of restrictive confinement were substantially similar, the prison was

required to afford procedural protection to an inmate before placing him in Phase III, just as it

was required to do before placing him in a DSU.  Id. at 282.  The trial court therefore issued a

declaratory judgment stating that Gilchrist's federal constitutional rights had been violated and enjoined defendants from keeping Gilchrist in restrictive confinement without a hearing.  Id. at 280-81.

However, the judge also ruled that the plaintiff's right to a hearing was not clearly established at the time of the infraction, entitling the defendants to qualified immunity from damages.  Id. at 280.  The defendants appealed.

The Appeals Court of Massachusetts vacated and remanded.  It held that questions of material fact remained as to what rights the plaintiff had been denied -- it was disputed whether Phase III conditions and DSU conditions really were substantially similar.  Id. at 283.

On remand, Gilchrist was consolidated with a similar case, Haverty v. Dubois, which became the lead case.[9]

## 2.    **Haverty v. Dubois**

In 1995, William Haverty brought a class action suit arising from the Security Threat Group Plan implemented that year.  Haverty I, 1999 WL 1487591, at *1.  The class requested only declaratory and injunctive relief.  See id.  On cross-motions for summary judgment, the court held for the plaintiffs in most aspects relevant here.  See id.

The trial court's factual findings were similar to those in Gilchrist, discussed above.  The court found that the conditions in the East Wing were significantly harsher than those in the West Wing, and were similar to the conditions in the former DSU.  Therefore, the trial court reasoned, the procedural protections granted to prisoners placed in a DSU were also required for

---

[9] Although the parties evidently agreed that there was no material difference between the two cases, see Agreed Mot. Consolidate & Stay Proceedings, Gilchrist v. Dubois, No. 93-6300-E (Mass. Super. Ct. Feb. 10, 2000) (allowed by endorsement order Feb. 16, 2000), Ex. J to Defs.' Br. (document # 92), Gilchrist's suit arose from the 1993 Phase System while William Haverty's arose from the 1995 Security Threat Group System.  Further, Gilchrist sought damages while the Haverty plaintiffs did not.

placement in the East Wing.  See id. at *5 (citing Longval v. Comm'r of Corr. (Longval I), 535

N.E.2d 588 (Mass. 1989)).  Because the factual record was largely undisputed, summary

judgment was appropriate.  Id. at *6.

On direct appellate review, the Supreme Judicial Court affirmed, but modified the trial

court's reasoning somewhat.  See Haverty II, 776 N.E.2d 973.  Its opinion closely tracked the

trial court's factual findings and reasoning as to whether the East Wing so resembled a DSU as

to invoke the necessity for procedural protections.  See id. at 986-87.  It modified only slightly

the trial court's decision, vacating the portion of the judgment that applied to new arrivals on the

expectation that they would be classified promptly and appropriately.  Id. at 991-92.  The SJC

explicitly declined to address any constitutional issue, confining its analysis to the state

regulations.  Id. at 976.

Finally, the case returned to the SJC in 2003.  Haverty v. Comm'r of Corr. (Haverty III),

792 N.E.2d 989 (Mass. 2003).  On remand to the superior court, the plaintiffs in Haverty had

asked that the trial court fashion an equitable remedy: awarding good-time credits for the time

spent in Phase III or the East Wing.  The trial court granted that request.  Id. at 991-92.  In the

trial court's view, "it [was] fair and just to award 50% of the maximum amount of earned good-

time credit that eligible members of the plaintiff class could have potentially received if they had

not been illegally confined."  Id. at 992.  Statutes required participation in approved programs to

earn the good-time credits, and such programs were generally unavailable in the East Wing.  See

id. at 991-95.  The SJC held that awarding credits without participation in the programs violated

the language of the applicable statutory provisions.  Id. at 994-95.  It therefore reversed the trial

court's award of the remedy.

-16-

### 3.     Longval v. O'Toole

This case was a damages suit arising from the aftermath of Haverty.  See Longval II, 2005 WL 910722.  Norman Longval alleged that he was a member of the Haverty class and, therefore, was the beneficiary of its rulings.  The court first determined that the doctrine of res judicata did not bar a subsequent damages suit after the Haverty class action, which had sought only prospective equitable relief.  Id. at *2-*4.  After a careful review of relevant Massachusetts case law, the court concluded that the constitutional right the plaintiffs vindicated in Haverty II was not clearly established at the time of Longval's injury, entitling the defendants to qualified immunity.  Id. at *4-*9.  As a result, it dismissed the case.

Longval appealed, and the SJC took direct appellate review and affirmed.  See Longval v. Comm'r of Corr. (Longval III), 861 N.E.2d 760 (Mass. 2007).  Its qualified immunity analysis was essentially a two-step holding.  First, it determined that the *law* was clearly established prior to 1995: Before placing prisoners in a DSU, or in a unit with conditions substantially similar to a DSU, corrections officials were required to afford the prisoners a hearing pursuant to Massachusetts regulations.  As a matter of *application of the law*, however, it was not clear in 1995 that conditions in the East Wing or Phase III were sufficiently similar to those in a DSU to trigger the hearing requirement.  See id. at 766-69.  In so reasoning, the SJC noted that it had split 4-3 in Haverty, with the three dissenters arguing that the conditions were not similar.  Id. at 769.[10]

---

[10] In addition to the cases mentioned above, at least three other Massachusetts courts have rendered unpublished decisions touching on the conditions at Cedar Junction.  See Dahl v. Comm'r of Corr., No. 01-P-146, 2004 WL 1586405 (Mass. App. Ct. July 15, 2004); Johnson v. DuBois, No. 951385, 1996 WL 1185052 (Mass. Super. Ct. Sept. 24, 1996); Tibbs v. Duval, No. 975295, 1998 WL 1284199 (Mass. Super. Ct. May 11, 1998).  However, none of these decisions is as important as Gilchrist, Haverty, or Longval.

**B.      Summary of Previous Federal-Court Litigation: Dellelo and Davila**

The federal courts have also briefly addressed the issues presented in these cases.  Two suits are noteworthy.

### 1.      Dellelo v. Maloney

In 2000, two prisoners at Cedar Junction brought a suit based on the STG System, asserting both federal and state-law claims.  See Compl., Dellelo v. Maloney, No. 00-cv-11813-EFH (document #1) (D. Mass. Aug. 31, 2000).  The court held that all but one claim was barred by the plaintiffs' failure to exhaust administrative remedies.  See Order at 1, Dellelo v. Maloney, No. 00-cv-11813-EFH (document #120) (D. Mass. June 14, 2005) (citing 42 U.S.C. § 1997e(a)).  The one remaining claim, a pendent state-law claim, the Court dismissed on qualified immunity grounds because the law was not "clearly established" at the time of the incident.  See id. at 2 (adopting Longval II's reasoning).

The First Circuit affirmed.  Delello v. Maloney, 233 Fed. App'x 15 (1st Cir. 2007) (per curiam) (unpublished opinion).  It noted that the Massachusetts Supreme Judicial Court had recently affirmed the Longval II decision upon which the district court had relied.  233 Fed. App'x at 16.  It did not consider the merits of the plaintiffs' argument that the SJC's qualified immunity decision was erroneous; rather, the First Circuit invoked the rule that the decisions of a state's highest court bind federal courts as to state law.  Id.  It also affirmed the dismissal of the plaintiffs' unexhausted claims.  Id.[11]

---

[11] In their motion for summary judgment, the defendants do not rely on the Prison Litigation Reform Act's exhaustion requirement, which does not apply retroactively to cases filed before the Act's enactment in 1996, see Salahuddin v. Mead, 174 F.3d 271, 274 (2d Cir. 1999).

### 2.    Davila v. Maloney

Victor Davila filed suit in 1998, also alleging procedural due process violations

stemming from the STG System.  See Compl., Davila v. Maloney, No. 98-cv-10508-DPW

(document #4) (D. Mass. Mar. 23, 1998).

The district court initially dismissed the action, seemingly on abstention grounds, after

taking judicial notice of pending state-court litigation.  Although it was careful to note that it

"offer[ed] no views with respect to the merits of [the state-court] proceedings," the court did find

that the plaintiff had not asserted any "actionable federal claims in [federal] court separate and

distinct from matters at issue in the state court litigation."  Mem. & Order at 1, Davila v.

Maloney, No. 98-cv-10508-DPW (document #31) (D. Mass. Sept. 30, 1999).  As an alternative

basis for its dismissal order, the court found that "[t]o the degree . . . some separate and distinct

[federal] claims can be discerned here, they are disposed of by governing Supreme Court

precedent."  Id. at 2.

The First Circuit vacated and remanded, finding that the district court should have

deferred jurisdiction to the state courts by staying the case, rather than dismissing it.  Davila v.

Maloney, No. 99-2163, 248 F.3d 1126, 2000 WL 1881910 (1st Cir. 2000) (table decision, text in

Westlaw).  The First Circuit "express[ed] no view on the merits of appellant's claims or on the

second part of the district court's decision" -- that is, the district court's suggestion that the

plaintiffs asserted no distinct, actionable federal claims.  Id. at *1.

After the stay was lifted, the district court dismissed the complaint on res judicata

grounds, holding that the Haverty litigation barred the plaintiffs' claim because a suit for

damages could have been brought in that suit but was not.  See Mem. & Order, Davila v.

Maloney, No. 98-cv-10508-DPW (document #50) (D. Mass. Jan. 4, 2005).  Upon a motion for

reconsideration, the court reaffirmed its judgment for the defendants, but on different grounds: it

held that the law at the time of the violation was not clearly established.  Therefore, "the doctrine

of qualified immunity bars plaintiff's damages claims."  Mem. & Order at 4, Davila v. Maloney,

No. 98-cv-10508-DPW (document #60) (D. Mass. Aug. 29, 2005).  The court also incorporated

its reasoning in its first memorandum of decision -- that any federal claims raised in the

complaint were barred by governing Supreme Court precedent.  See id. at 4-5 (citing Mem. &

Order, Davila v. Maloney, No. 98-cv-10508-DPW (document #31) (D. Mass. Sept. 30, 1999)).

The First Circuit affirmed.  Davila v. Maloney, No. 05-2520 (1st Cir. Oct. 2, 2007), Ex.

U to Defs.' Br. (document #92).  It followed Longval III on the state law claims, and merely held

that the defendants were entitled to qualified immunity on the plaintiffs' federal claims because

the law was not "clearly established" at the time of the alleged violations.  See id.

### C.        The Binding Effect of the Federal-Court Litigation

The defendants assert that "the federal constitution[al] questions implicated have been

decided by the United States Court of Appeals for the First Circuit."  Defs.' Br. at 26 (document

#92).  It is therefore necessary to examine the federal courts' decisions in Dellelo and Davila in

some detail.

Clearly, Dellelo cannot constitute binding precedent for this case.  The First Circuit's

decision only addressed two broad categories of claims: a single pendent state-law claim and

"remaining claims."  It concluded that the former claim was barred by Haverty II, and the

remainder were unexhausted.  It surely did not pass on the merits of the plaintiffs' constitutional

claims, or on the question of whether *federal* law (in contrast to state law) was sufficiently

"clearly established" to permit a suit for damages.

While Davila addresses the issues somewhat more squarely, it would be a mistake to treat it as binding precedent -- contrary to the defendants' largely unsupported argument that it "must be controlling here."  Defs.' Br. at 27 (document #92).  The case was litigated by a pro se prisoner without the support of amicus counsel, despite the difficult issues of qualified immunity involved.  See 1st Cir. Court of Appeals Docket, Davila v. Maloney, No. 05-2520.  The First Circuit decided the issue summarily, per Local Rule of Appellate Procedure 27(c), in an unpublished opinion, per Local Rule of Appellate Procedure 32.3.  Courts in this District have divided on whether unpublished opinions constitute binding -- as opposed to persuasive -- precedent.  Compare Hoilett v. Allen, 365 F. Supp. 2d 110, 114 n.9 (D. Mass. 2005) (stating that an unpublished decision "may not be cited as precedent") (Lindsay, J.), with Alshrafi v. Am. Airlines, Inc., 321 F. Supp. 2d 150, 159-160 & nn. 9-10 (D. Mass. 2004) (Young, J.) (treating unpublished decision as "binding," although distinguishing it on the merits).  Under these circumstances, where the issue was litigated by a pro se prisoner and not comprehensively examined and addressed by the First Circuit, the Court will decline to treat Davila as binding. Instead, it will consider Davila only to the extent that it finds its reasoning persuasive.  See 1st Cir. R. 32.3(a)(2) ("The court will consider [unpublished] opinions for their persuasive value but not as binding precedent.").

## IV.   ANALYSIS OF THE PLAINTIFFS' LIBERTY INTEREST

In Pearson v. Callahan, 129 S. Ct. 808 (2009), the Supreme Court freed federal courts from the rigid "order of battle rule" set forth in Saucier v. Katz, 533 U.S. 194, 201 (2001), which held that a court seeking to resolve a government official's claim of qualified immunity must first decide whether the facts proved by the plaintiff make out a constitutional violation before determining whether the violated right was "clearly established" at the time of the defendant's

alleged misconduct.  Nevertheless, the Court continues to believe that the "better approach" to

resolving most cases in which the defense of qualified immunity is raised is to determine first

whether the plaintiff has demonstrated that he was deprived of a constitutional right.  County of

Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).  Clearly, a court's threshold inquiry into

whether a constitutional violation has occurred serves the salutary purpose of clarifying and

elaborating on existing law.  Saucier, 533 U.S. at 201 ("In the course of determining whether a

constitutional right was violated on the premises alleged, a court might find it necessary to set

forth principles which will become the basis for a holding that a right is clearly established.  This

is the process for the law's elaboration from case to case, and it is one reason for our insisting

upon turning to the existence or nonexistence of a constitutional right as the first inquiry.  The

law might be deprived of this explanation were a court simply to skip ahead to the question

whether the law clearly established that the officer's conduct was unlawful in the circumstances

of the case.").[12]  And this is particularly the case in connection with prison condition litigation.

Accordingly, the Court will first consider whether defendants violated plaintiffs' constitutional

rights before determining whether they are entitled to qualified immunity because the law they

are accused of violating was not "clearly established."

　　　In determining whether defendants violated plaintiffs' rights under the Due Process

Clause, the Court must first consider whether the plaintiffs had a cognizable liberty interest in

avoiding transfer to restrictive housing within Cedar Junction.  It views the relevant facts -- the

conditions in Phase III and the East Wing -- n the light most favorable to the non-moving party,

---

[12] See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of
Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009) (presenting an empirical examination of judicial decisions that
suggests that mandatory sequencing is necessary for the robust articulation of constitutional rights by lower courts).

the plaintiffs.  See Morelli v. Webster, 552 F.3d 12, 15, 18-19 (1st Cir. 2009).  The conditions in

the most restrictive units are assumed not to be materially different as between the 1993 Phase

System and the 1995 STG System.  See Gilchrist, 717 N.E.2d at 280 n.4 ("Regarding the

reduction to two levels of restriction, . . . it had resulted in only minor alterations."); 1st Am.

Compl. ¶ 37, Peterson v. Dubois, No. 93-cv-12725 (document #56) ("[T]he restrictions in the

STG blocks are identical to those that existed in [Phase III].").

        To determine whether a violation occurred, the Court looks to whether the restraint the

prisoner seeks to avoid constitutes  an "atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484.[13]  How the "ordinary incidents

of prison life" should be defined is not entirely clear: as the Supreme Court has noted, the courts

of appeals have been unable to agree on where to locate that baseline.  See Wilkinson, 545 U.S.

at 223; see also Skinner v. Cunningham, 430 F.3d 483, 486-87 & n.1 (1st Cir. 2005) (collecting

cases).  The First Circuit has not yet decided the issue.  See Skinner, 430 F.3d at 487.

        However, as in Wilkinson, which dealt with Ohio's "Supermax" facility, the conclusion

is inescapable that the assignment of prisoners to Phase III and the East Wing clearly "impose[d]

an atypical and significant hardship under any plausible baseline."  545 U.S. at 223.  Plaintiffs

_____

        [13] As explained above, Sandin sets forth the proper legal standard against which to judge the
constitutionality of both the 1993 Phase System and the 1995 STG System.  It is clear, however, that even if Sandin
did not apply to the 1993 Phase System, the plaintiffs would have had a liberty interest in avoiding assignment to
Phase III.  For the reasons explained in Haverty II, see generally 776 N.E.2d at 975-92, the defendants were required
to comply with the DSU regulations when assigning prisoners to Phase III.  Under the previous Hewitt regime, the
mandatory nature of the regulations would have been sufficient to create a liberty interest.  Hewitt v. Helms, 459
U.S. 460 (1983); see also Parenti v. Ponte, 727 F.2d 21, 24-26 (1st Cir. 1984) (examining Massachusetts regulations
and holding that under Hewitt, a state prisoner had a liberty interest in avoiding placement in the DSU); Longval v.
Comm'r of Corr. (Longval I), 535 N.E.2d 588, 591 (Mass. 1989) (holding that the DSU regulations must be applied
whenever the conditions to which a prisoner might be assigned are "substantially the same" as a DSU, because a
prison cannot "sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a
D.S.U. by assigning as a pretext another name to such a unit"); Kenney v. Comm'r of Corr., 468 N.E.2d 616 (Mass.
1984) (squarely holding that compliance with Massachusetts regulations was mandatory before placement in the
DSU).

had perhaps a total of four hours each week in which they could interact with fellow prisoners. Haverty II, 776 N.E.2d at 978 & n.13. They ate alone and received far fewer canteen privileges than other prisoners. Id. at 978. They had to remain in their cells for approximately 22.5 or 23 hours each day, id., and time spent showering and making phone calls was counted against their out-of-cell time, id. at 980 & n.17. Minimal jobs or educational programs were available, which meant that prisoners had greatly reduced opportunities to earn good-time credits. See Haverty III, 792 N.E.2d at 991-92.[14] Finally, as discussed in more detail below, prisoners were assigned to Cedar Junction's restrictive confinement not for a short time, but rather for an indefinite duration. And they could not be reassigned to a less restrictive area for at least six months. See Haverty II, 776 N.E.2d at 978-79, 981. Indeed, the average duration of assignment to the East Wing was a striking 270 days. Id. at 978 & n.15.

The defendants, by contrast, have not developed any facts that would compel a conclusion that the plaintiffs' placement in restrictive confinement was remotely "rational," that it was "not excessive" in duration, or that the stricter conditions imposed on such prisoners were "essential to [the segregation's] purpose." Skinner, 430 F.3d at 487 (holding that sixty-day confinement in administrative segregation while plaintiff was investigated for the murder of another inmate did not implicate a liberty interest). Indeed, as discussed more extensively below, in many cases the defendants did not articulate any rational reason for placing prisoners in Phase III or the East Wing and ignored their own classification scheme. See Haverty II, 776

---

[14] While there is no constitutional or statutory right to good-time credits, Jackson v. Hogan, 446 N.E.2d 692, 695 (Mass. 1983), and the decision to make programs available to prisoners is properly left to the discretion of the Department of Correction, Haverty III, 792 N.E.2d at 993, the Court may still consider plaintiffs' reduced opportunity to earn good-time credits when comparing conditions in the East Wing or Phase III to the "ordinary incidents of prison life." See Wilkinson, 545 U.S. at 224 (considering, as one factor, the fact that placement in restrictive confinement rendered prisoners ineligible for parole consideration).

N.E.2d at 980 (noting that transfer from the West Wing to the East Wing was not imposed for commission of a disciplinary offense), 981-82 (citing undisputed testimony that prison officials ignored classification score).

Taken together, the deprivations suffered by plaintiffs and the indefinite duration of their stay in restrictive housing constitute an "atypical and significant hardship" when compared to any reasonable baseline.  Cf. Wilkinson, 545 U.S. at 223-24.  The harsh conditions imposed on plaintiffs "may well [have been] necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners.  That necessity, however, does not diminish [the] conclusion that the conditions give rise to a liberty interest in their avoidance."  Id. at 224 (internal citation omitted).

## V.  THE MATHEWS BALANCING TEST

Because the plaintiffs had a liberty interest in avoiding assignment to restrictive housing at Cedar Junction, the Mathews balancing test determines the quantum of due process necessary to protect that interest.  See Wilkinson, 545 U.S. at 224-25.  The Mathews test weighs three factors: the private liberty interest at risk; the risk of erroneous deprivation and the utility of more process in diminishing that risk; and the government's interest, including financial and administrative burdens.  Id. (quoting Mathews, 424 U.S. at 335).  Each is addressed in turn as the Court evaluates whether the facts of this case, when viewed in the light most favorable to the plaintiffs, demonstrate a constitutional violation.

The first factor to consider is the weightiness of the plaintiffs' liberty interest.  As noted above, the plaintiffs' assignment within Cedar Junction determined in part their access to social events, physical recreation, personal hygiene, and other necessities for mental and physical health.  Even if plaintiffs received all of the privileges detailed in the Inmate Orientation

Handbook, their opportunities to see other prisoners and to exercise were considerably curtailed.

Those are substantial interests, fundamental to the treatment of human beings no matter what

their status and plainly worthy of procedural protection.  At the same time, the context must be

considered: Regardless of their precise placement, plaintiffs were prisoners in a maximum

security prison.  As the Supreme Court noted in Wilkinson, the private interest at stake in such

an inmate's assignment is much more than minimal, but certainly diminished compared to

deprivations imposed on a non-inmate.  545 U.S. at 225.

The second Mathews factor is the risk that the prisoners ran of erroneous deprivation, and

the extent to which additional procedural safeguards could have reduced this risk.  Here, it is

clear that the prisoners did face erroneous assignment to restrictive confinement.  The

assignment decision was an "entirely subjective and discretionary function of the prison

authorities."  Haverty II, 776 N.E.2d at 981.  Massachusetts regulations called only for biannual

review of inmate assignments, and no other procedures were available to exit the more restrictive

confinement.  See id.  In actuality, assignments were reviewed even less often.  "[F]ewer than

fifteen per cent of prisoners [were] reviewed within one year of their initial placement in the East

Wing."  Id.  Prison officials did not follow the classification guidelines that had been

promulgated.  Id. at 981-82.  They "did not compile a classification score in 200 out of 486

cases, and in those cases in which scoring had been completed, the defendants ignored the results

one-half of the time."  Id.

It follows that more procedural safeguards -- even if only those required by regulation --

would have reduced the risk of erroneous deprivations.  To be sure, this is not to say that the

defendants can never justifiably depart from their own classification scheme to restrictively

confine a prisoner when there is a reason to do so.  But having tacitly admitted that there is a

spectrum within which prisoners can fall, the defendants are not privileged to ignore it.  And that is precisely what the plaintiffs here claim happened to them.  <u>See, e.g.</u>, 1st Am. Compl. ¶¶ 40-49, <u>Peterson v. Dubois</u>, No. 93-cv-12725 (document #56).

<u>Wilkinson</u> is again a useful comparison.  In that case, prisoners who were assigned to a supermax prison were given "notice of the factual basis leading to consideration for . . . placement [in restrictive confinement] and a fair opportunity for rebuttal."  545 U.S. at 225-26. As the Supreme Court noted, "these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations."  <u>Id.</u> at 226.  Moreover, prisoners so assigned had the opportunity to appeal.  <u>See id.</u>  And their placement was reviewed within thirty days.  <u>Id.</u> at 227.  Under Massachusetts's regulations, prisoners assigned to a DSU would have received a similar level of procedural protection.  <u>See Haverty II</u>, 776 N.E.2d at 979 & n.16.  But those assigned to Phase III or the East Wing did not.  <u>See id.</u> at 981.

In weighing the third <u>Mathews</u> factor (i.e., the government's interest), it is important to remember that this is not a case in which plaintiffs challenge prison officials' decision to institute a lockdown in exigent circumstances.  It is not even a case in which prison officials assigned inmates to restrictive housing without a hearing but then provided adequate post-deprivation process by reevaluating the assignments in a prompt manner.  Instead, plaintiffs were assigned to Phase III or the STG Blocks and left there, with no notice or opportunity to be heard, <u>see id.</u> at 980, and without any means of contesting their assignment for a substantial period of time afterwards, <u>see id.</u> at 981.  Although the government certainly has an interest in avoiding the imposition of new, costly, and complicated procedural requirements, especially in the context of a state prison, the defendants' decision to assign the plaintiffs to Phase III or the East Wing

was "entirely subjective and discretionary." Id. at 981.  It is not just that the defendants did not

afford the plaintiffs *due* process.  They provided them with no meaningful process at all.

## VI.   QUALIFIED IMMUNITY

Weighing the factors discussed in the preceding section, the Court concludes that, when

the facts are viewed in the light most favorable to the plaintiffs, the defendants have failed the

Mathews balancing test and thus have violated the plaintiffs' rights under the Due Process

Clause.

But since this is an action for damages, and not merely for injunctive relief, this

conclusion does not end the Court's inquiry.  Instead, the Court must determine whether the

defendants, despite their apparent violation of the plaintiffs' constitutional rights, are entitled to

qualified immunity.

After reviewing the applicable law, this Court is obliged to grant the defendants' motion

for summary judgment on the issue of qualified immunity.  The Massachusetts Supreme Judicial

Court has already concluded in Longval III that the defendants are entitled to qualified immunity

under state law because it would not have been apparent to a reasonable official in their position

that the conditions in the East Wing (and thus in Phase III) were sufficiently similar to the

conditions in a DSU to trigger the procedural protections provided in the DSU regulations.  861

N.E.2d at 765-69.   And given that decision, it is impossible to conclude that the 1993 Phase

System violated clearly established federal rights either.  Before the Supreme Court's June 19,

1995, decision in Sandin v. Conner, 515 U.S. 472, the question of whether the plaintiffs had a

liberty interest in avoiding placement in Phase III was governed by the test articulated in Hewitt

v. Helms, 459 U.S. at 471-72, which counseled courts to analyze the language of state statutes

and regulations to determine whether the state had created a liberty interest in avoiding

restrictive prison conditions.  If it was not clear that the DSU regulations applied to prisoners placed in Phase III, it was similarly unclear whether Massachusetts had created a federal liberty interest in avoiding such a placement.

The Court's decision in <u>Sandin</u> did little, if anything, to make clear the unconstitutionality of the defendants' conduct.  <u>Sandin</u>'s holding that a state may create a liberty interest in avoiding an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" was stated at a high level of generality with little elaboration that would aid in its application to particular cases.  <u>Sandin</u>, 515 U.S. at 484.  Indeed, courts have since struggled to define the baseline against which a hardship's atypicality and significance should be judged.  <u>See Wilkinson</u>, 545 U.S. at 223; <u>see also</u> <u>Skinner</u>, 430 F.3d at 486-87.  If, for example, the baseline were the conditions of confinement in the same prison at the time, then the fact that a majority of the prisoners at Cedar Junction were housed in the more restrictive East Wing would militate against a finding that the plaintiffs' liberty interest, and thus right to due process, was clearly established.  <u>Haverty II</u>, 776 N.E.2d at 996 (Cordy, J., dissenting).  If the standard were that imposed by the Fifth and Seventh Circuits, which interpreted <u>Sandin</u> as foreclosing most due-process challenges to administrative segregation or disciplinary confinement, the result would be even less favorable to the plaintiffs.  <u>See</u> <u>Orellana v. Kyle</u>, 65 F.3d 29, 32 n.2 (5th Cir. 1995) (per curiam); <u>Wagner v. Hanks</u>, 128 F.3d 1173, 1175-76 (7th Cir. 1997).

One good result of the litigation in connection with the conditions in Phase III and the East Wing has been that the obligations of the state going forward have been clarified.  But since the defendants' obligation to afford the plaintiffs greater procedural protections was not clear at the time that the defendants acted, they are entitled to qualified immunity.  <u>See</u> <u>Davila v. Maloney</u>, No. 05-2520 (1st Cir. Oct. 2, 2007), Ex. U to Defs.' Br. (document #92).

## VII.    <u>CONCLUSION</u>

Taking the facts in the light most favorable to the plaintiffs as the non-moving parties, they have asserted a cognizable liberty interest in avoiding transfer to Phase III or the East Wing of Cedar Junction.  Moreover, they have asserted that the defendants provided essentially no process at all before transferring them.  Under <u>Sandin</u> and <u>Wilkinson</u>, they have alleged the deprivation of a constitutional right.  However, since the unconstitutionality of the defendants' conduct was not clearly established, they are entitled to qualified immunity.  Thus, the defendants' Motion for Summary Judgment (**document #91**) is **GRANTED** and Plaintiff William Tyree's Motion for Partial Summary Judgment (**document #87**) is **DENIED**.

**SO ORDERED.**

**Date:  January 11, 2010**          _/s/ Nancy Gertner_
                                                        **NANCY GERTNER, U.S.D.C.**